UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| KEVIN SCHIAVONE,<br><br>        Plaintiff<br><br>v.<br><br>CITY OF LAWRENCE, et al.<br><br>        Defendants | Case No.: 1:19-cv-10435-RWZ |

## AMENDED COMPLAINT

The Plaintiff, Detective Kevin Schiavone, brings this action seeking redress for substantial violations of his rights pursuant to the Federal Civil Rights Act, 42 U.S.C. § 1983, as well as under certain Massachusetts Civil Rights, and under the Massachusetts Whistleblower Act, M.G.L. c. 149, § 185, by retaliation against him for reporting and refusing to participate in what the Plaintiff reasonably believed was a felony level violation of law, ethical violations, collective bargaining violations and procedural rules and policy violations within the City of Lawrence Police Department, specifically by Defendants Chief Roy Vasque ("Chief Vasque") and Lieutenant Mark Ciccarelli ("Lt. Ciccarelli"). The Plaintiff brings claims for violations of the common law as well.

## JURISDICTION

The Plaintiff asserts federal jurisdiction under 42 U.S.C. § 1983, and pendent jurisdiction of his state law claims under 28 U.S.C. § 1367.

## PARTIES

1.      The Plaintiff, Kevin Schiavone (hereinafter "Plaintiff" or "Detective Schiavone"), is an individual residing in Methuen, Essex County, Commonwealth of Massachusetts, currently employed by the City of Lawrence, Police Department.

2.      The Defendant, City of Lawrence (hereinafter "City" or "Lawrence"), is a municipality duly incorporated under the laws of the Commonwealth of Massachusetts.

3.      The Defendant, Chief Roy Vasque (hereinafter "Defendant Vasque" or "Chief Vasque"), is an individual residing in Amesbury, Massachusetts and employed by the Lawrence Police Department, currently holding the rank of Chief within the Department.

4.      The Defendant, Lieutenant Mark Ciccarelli (hereinafter "Defendant Ciccarelli" or "Lt. Ciccarelli"), is an individual residing in Topsfield, Massachusetts and employed by the Lawrence Police Department, currently holding the rank of Lieutenant within the Department.

## FACTUAL ALLEGATIONS

### Detective Kevin Schiavone

5.      Plaintiff is employed as a Detective for the City and has worked as a police officer for the City for approximately 10 years.

6.      Plaintiff is, and has always been, a dedicated, energetic and hardworking employee. He has been a respected member of the Lawrence Police Department (hereinafter "LPD") for many years and is a well-known and appreciated member of his community at large.

7.      Detective Schiavone is a proud third generation public servant with the City, following in the footsteps of his Father, Grandfather, Uncle and Cousin—all decorated police officers with the City of Lawrence Police Department.

8.      Throughout his career, Detective Schiavone has worked diligently and has devoted himself to his chosen life vocation, placing the public's safety at the forefront and performing his duties with honesty and integrity.

9.      Detective Schiavone has never previously been disciplined in his 10 years of service as a member of the Lawrence Police Department.

### Lt. Ciccarelli's and Chief Vasque's Improper Actions and Detective Schiavone's Whistleblower Activities

10.     On or about December 21, 2017 the detective's division held a Christmas party at the Relief's Inn, at 1 Market Place in Lawrence.

11.     Before the party, Lt. Ciccarelli handed Detective Schiavone $300.00 in cash to purchase items and Chinese food for the Christmas party event. Chief Vasque (then Captain) told Schiavone to keep the amount under $300.00. (At the time, Ciccarelli and Vasque shared an office).

12.     Lt. Ciccarelli made no mention of where the $300.00 had come from, and Detective Schiavone had no reason to suspect anything improper was being done nor did he inquire further from Lt. Ciccarelli.

13.     Detective Schiavone purchased items at Walmart and the Chinese food as directed, and the party took place with the consumption of these purchased items and Chinese food.

14.     The party actually cost more than the allotted $300.00, however, other detectives pitched in funds out of their own pockets to pay for the added amounts.

15.     On or about January 12, 2018 Lt. Ciccarelli called Detective Schiavone while he was waiting to testify at a murder case hearing. He told him that then Captain Vasque had just been promoted to Chief. Because of this, Lt. Ciccarelli told Detective Schiavone that Chief Vasque could not put in a reimbursement slip for the $300.00 they gave to Detective Schiavone for the

items and food for the party and that he wanted Detective Schiavone to put in the reimbursement slip instead, receive payment from the City and give it to him.

16.     Detective Schiavone acknowledged Lt. Ciccarelli's request, without giving him any direct permission to do anything on his behalf, and told Detectives Angel Mejia and Jay Haggarty what the Lieutenant had just asked him to do, telling them that he felt uneasy about what he had just been asked to do by Lt. Ciccarelli. The other detectives expressed that they felt it was improper.

17.     On January 16, 2018, Detective Schiavone returned to work, he did not see the reimbursement form that Lt. Ciccarelli had spoken about. Being unable to speak to the Lieutenant or payroll secretary due to busy work events, Detective Schiavone called the payroll secretary Annette Messina (hereinafter, Messina) later that evening and asked her if Lt. Ciccarelli had put in any reimbursement slips with his name on it. She affirmed that in fact, Lt. Ciccarelli had put in a reimbursement slip with Detective Schiavone's name and signature (under penalty of perjury) on it. She said he had also altered the form with white out, changing the Captain's name in the employee signature field and name field and signed his (Schiavone's) name in its place.

18.     Detective Schiavone told Messina that he was not authorizing her to submit the form and that he would get the form in the morning and address it with Lt. Ciccarelli.

19.     The next day, Detective Schiavone obtained the reimbursement slip from Messina and took a picture of it. It had his name written on top, requesting $298.18 in non-personal reimbursement, an unauthorized signature of his name and messy approval signature of what appeared to him to be R. Vasque.

20.     Detective Schiavone discussed the form with Lt. Ciccarelli, telling him he never gave him permission to sign his name and told him that he has no authority to sign his name to anything after the Lieutenant told him he was under the impression he could do so.

21.     Lt. Ciccarelli asked Detective Schiavone if he thought he was doing something wrong and the Detective answered "Yes I do." He went on to tell the Lieutenant that if he was doing something wrong, to keep him out of it and to not sign his name to anything.

22.     Lt. Ciccarelli asked Detective Schiavone if he had told anyone else about "this."

23.     Detective Schiavone replied that he had told Detectives Angel Mejia and Jay Haggerty (who had been with him at the time the Lieutenant had called him).

24.     Lt. Ciccarelli told Detective Schiavone that they were "the enemy" then questioned Detective Schiavone's loyalty to him (Ciccarelli).

25.     Detective Schiavone left the room after telling Lt. Ciccarelli that he "works with these guys" and has nothing to hide. The conversation and interaction between the two ended at that time with Lt. Ciccarelli obviously upset with Detective Schiavone.

26.     On January 18, 2018, Lt. Ciccarelli ordered Detective Schiavone to come off the road and meet with him in his office. He told Detective Schiavone that he did not appreciate the way he had been spoken to the day before and that the tone was accusatory and disrespectful. Detective Schiavone apologized and told the Lieutenant again that he wanted his name off any paperwork for reimbursement, feeling it was inappropriate and that the Lieutenant should put in a slip for reimbursement in his own name, or better yet, pay for the party out of his own pocket and not seek a reimbursement he wasn't entitled to.

27.     Lt. Ciccarelli was again, upset with Detective Schiavone, and told him that that he would be speaking to Chief Vasque about the situation and would leave the detective out of it.

28.     Upon information and belief, Lt. Ciccarelli drafted and submitted a new reimbursement slip with now Chief Vasque's signature on it and submitted it to the City.

29.     On January 19, 2018, Lt. Ciccarelli sent Detective Schiavone a series of emails/texts while reviewing his cases questioning his performance, which was unusual behavior for Lt. Ciccarelli and occurred right after the above noted discussions and comments.

30.     On or about January 20th and afterwards, Detective Schiavone learned information from Lawrence Police Department employee Melissa Ragonese.

31.     Melissa Ragonese (hereafter "Ragonese") is the detective drug unit's confidential secretary, and responsible for keeping records for the "drug safe" used by the unit for "buy" monies and other investigative purposes. She is also a secretary for the general detective unit.

32.     Lt. Ciccarelli and then Captain Vasque supervised the drug unit, its personnel and investigations. They also oversaw access to the drug safe.

33.     Upon information and belief, Ragonese told Detective Schiavone that shortly after his encounter with Lt. Ciccarelli, a shortage of unaccounted for monies was discovered missing from the drug safe.

34.     Upon information and belief, Ragonese began an audit of the safe's contents, reviewing an excel spreadsheet she had developed to account for drug safe contents.

35.     Upon information and belief, Lt. Ciccarelli met with detectives in an interrogation room to determine where the unaccounted for monies had gone.

36.     During this accounting, Ragonese discovered that she had documented monies that had been properly given to Detective Carmen Purpora for a drug buy in an investigation. She also discovered an IOU slip for $300.00 that had been in the safe, signed by Lt. Ciccarelli. Upon inquiry of the Lieutenant, he told her "Don't worry about that."

37.     During this time and afterward, Detective Schiavone learned of other activities of questionable nature that Lt. Ciccarelli and Chief (then Captain) Vasque had been participating in.

38.     He learned this information from the detectives in his unit and the drug unit who were directly involved or observed this behavior. Detective Schiavone also observed some of this behavior.

39.     Both Lt. Ciccarelli and Captain Vasque would often begin drug investigations at or after 3:00 pm and 4:00 pm in the afternoon, after their shifts were over.

40.     The investigations would often go several hours, with drug detectives putting in bonafide over-time hours for the work.

41.     Often, Lt. Ciccarelli and Captain Vasque would initially make a radio or phone call to begin the investigation to document it, and then not participate whatsoever in the investigation or supervision of it.

42.     Often, the next day, Lt. Ciccarelli and/or Captain Vasque would pull the detectives into their office to "get the slips together" and coordinate what times everyone put on their slips.

43.     Upon information and belief, the two would then put in their own over-time slips for payment from the department for time they did not actually work the over-time.

44.     Upon information and belief, Lt. Ciccarelli and/or Captain Vasque would instruct the detectives who were on scene with the investigation, to write in their reports that they were on scene as well, when in reality, they were not on the scene or even on duty at the time.

45.     Upon information and belief, often, an on scene list of officers was given to the Essex County District Attorney's Office and Lt. Ciccarelli and/or Captain Vasque would report for court, sign in to receive appearance slips, and then leave so as to be paid for further court/over-time pay, often for cases they had no involvement in.

46.     Upon information and belief, Detectives Carmen Purpora, David Moynihan and Radamus Gonzalez have direct knowledge of these events and one or more were directed to write the Lieutenant's and/or Captain's name in the reports even though they never were on scene.

47.     On or about February 7, 2018, Detective Schiavone met with F.B.I. Agent Larry Travaglia along with another Lawrence Police detective, to report the above described alleged illegal activities.

48.     Upon information and belief, this was not the first time a Lawrence Police detective had reported this type of activity to F.B.I. Agent Travaglia. On or about February 18, 2017 and January 30, 2018, Agent Travaligia spoke with a Lawrence Police detective (other than Detective Schiavone) about Lt. Ciccarelli's and then Captain Vasque's behaviors.

49.     Upon information and belief, Lt. Ciccarelli and Chief Vasque became aware of Detective Shiavone's discussions with Agent Travaglia.

50.     The relationship between Lt. Ciccarelli and Detective Schiavone continued to deteriorate.

51.     Lt. Ciccarelli began pulling Detective Schiavone off from over-time duties and sending him home so as not to be present at the department or scenes working, earning over-time.

52.     F.B.I. Agent Travaglia retired a short time after Detective Schiavone discussed the above information with him and the detective contacted Travaglia's supervisor, Supervisory Senior Resident Agent Crosby Brackett regarding his prior discussions with Travaglia.

53.     On or about August 15, 2018 Detective Schiavone was on duty in the detective bureau interview room, interviewing a citizen regarding a case he was assigned to work on. The citizen's 12 year old child was in the detective bureau offices and within a few feet of Lt. Ciccarelli's open office door and an unsecure loaded firearm belonging to Lt. Ciccarelli.

54.     Lt. Ciccarelli's office was unoccupied with both office doors ajar and Lt. Ciccarelli was not in the area, to Detective Schiavone's knowledge.

55.     Lt. Ciccarelli had left a canvas, police duty type bag on a chair in his office next to the open door and within clear view from outside an office window from where the 12 year old boy had been located.

56.     Lt. Ciccarelli's department issued handgun (Smith & Wesson P226) was clearly visible, unsecure, inside of the unzipped duty bag, fully loaded with its magazine inserted, holding 12 rounds of ammunition.

57.     Massachusetts law, specifically, M.G.L. c. 140 § 131L provides that:

> "It shall be unlawful to store or keep any firearm…in any place unless such weapon is secured in a locked container or equipped with a tamper-resistant mechanical lock or other safety device, properly engaged so as to render such weapon inoperable by any person other than the owner or other lawfully authorized user."

> G.L. c. 140, § 131L

58.     Detective Schiavone became aware of Lt. Ciccarelli's absence from the building and the unattended bag and unsecure firearm only after the 12 year old child left the detective bureau's area.

59.     Detective Schiavone was also made aware of Lt. Ciccarelli not being in the building from Detective Angel Mejia who had entered the detective bureau office briefly before leaving for the day.

60.     Detective Schiavone took responsibility to safeguard Lt. Ciccarelli's unsecure firearm as he continued working in the detective bureau office following the discovery.

61.     Captain Michael Driscoll entered the detective office area a short time later, inquiring where Lt. Ciccarelli was. Detective Schiavone then alerted the Captain to the unsecure

firearm. Captain Driscoll took possession of the firearm after walking into Lt. Ciccarelli's office and witnessing the unsecured firearm inside the open duty bag. Captain Driscoll left the office with the firearm in hand, and properly secured it.

62.     On or about August 22, 2018, Detective Schiavone sent an email to Captain Driscoll asking him if he needed to provide any documentation regarding the unsecure firearm in Lt. Ciccarelli's office. Captain Driscoll returned an email advising Detective Schiavone no, and that he had already addressed the issue.

**Retaliation by Lt. Mark Ciccarelli and Chief Roy Vasque**

63.     On August 23, 2018 Lt. Ciccarelli called Detective Schiavone (who was on-duty and on the road) on his cell phone and told him to return to the police station to see him.

64.     Detective Schiavone waited in the detective division office while Lt. Ciccarelli was speaking with Captain James Fitzpatrick in Lt. Ciccarelli's office.

65.     Lt. Ciccarelli exited his office and told Detective Schiavone to follow him into a police interrogation/interview room. Detective Schiavone found it odd that Lt. Ciccarelli requested to speak to him in that particular room and commented to Lt. Ciccarelli about the location.

66.     Lt. Ciccarelli told Detective Schiavone to sit down, left the room and returned with Sergeant Amanda Burke (hereinafter "Sgt. Burke") and Sergeant Joseph Beaulieu (hereinafter "Sgt. Beaulieu")

67.     Lt. Ciccarelli then asked Detective Schiavone questions involving the August 15th incident about the unattended firearm. As Det. Schiavone answered the questions, Lt. Ciccarelli told him he was lying and unprofessional in handling the incident.

68.     Detective Schiavone asked the three superior officers in the room if the interview was about him or if it had to do with anything regarding his work performance. None of the three

superior officers answered him. Detective Schiavone then asked if he was being "written up" for something he did and indicated he wanted union representation. None of the three superior officers answered him and he was not given an opportunity to seek union representation.

69.     Detective Schiavone attempted to get up and exit the room. Lt. Ciccarelli ordered him to stay in the room, suggesting discipline if he left.  Lt. Ciccarelli intimidated Detective Schiavone by his physical demeanor and raised voice. The Lieutenant continued berating Detective Schiavone even after he indicated that the interrogation warranted his union representative being present.

70.      Lt. Ciccarelli made Detective Schiavone feel uncomfortable and fearful of his employment status during the interrogation by his actions and behavior, and by doing so in a criminal interrogation room with other supervisors present.

71.     Following this incident with Lt. Ciccarelli, Sgt. Burke and Sgt. Beaulieu, Detective Schiavone reported the incident to his Union President Detective Alan Andrews (hereinafter, Detective Andrews) and informed other co-workers as well. He also called Captain Driscoll and left a message on his cell phone when he did not answer.

72.     Later, after the incident, Detective Schiavone felt he could no longer stay at work and requested Sgt. Burke allow him to leave using personal earned time. She agreed and Detective Schiavone went home.

73.     Chief Vasque contacted Detective Schiavone via email and advised him to not return to work the following date (Friday, August 24, 2018). The Chief advised Detective Schiavone that he would hear from Captain Driscoll before returning to work.

74.     Captain Driscoll did not contact Detective Schiavone and upon his inquiry, Chief Vasque emailed Detective Schiavone on August 26, 2018, advising him to report to work the following day and receive a work assignment from the Chief.

75.     Following Detective Schiavone's return to work, on August 27, 2018 he was ordered by Chief Vasque to report to his office. During an accusatory-style interview by Chief Vasque he was wrongfully accused of being insubordinate to Lt. Ciccarelli; wrongfully accused of sending a letter to Mayor Daniel Rivera documenting the incident with Lt. Ciccarelli; and, advised by Chief Vasque that if he failed a lie detector test and was found to be lying, he could be terminated.

76.     Detective Schiavone also learned that Sgt. Burke and Sgt. Beaulieu had written in reports that he had been insubordinate and out of control while speaking with Lt. Ciccarelli during his interrogation. Detective Schiavone requested to view these reports, and was denied access to them.

77.     Following the meeting with Chief Vasque, Detective Schiavone was ordered to report to the evidence room until further notice. He was given no direction, clearance or keys to his assigned area. Detective Schiavone was made to wait outside the locked evidence room area until he was let in by detectives assigned to the area.

78.     Detective Schiavone worked in the evidence area alongside Detective Andrews and Detective Jeff Hart for three days without clear definition as to his assignment and without authorization codes or keys to be in the area.

79.     At one point after Detective Schiavone made complaints and requests from Detective Andrews as Union President, he was advised by him that per the Union's attorney

Matthew Dwyer that no Union support was forthcoming. He went on to tell Detective Schiavone

that he was "lucky" and that ending up in Evidence was a "soft landing" and he should be grateful.

80.     On August 29, 2018, Chief Vasque called Detective Schiavone when he was off

duty and spoke with him for nearly an hour. During the conversation, he stated to Detective

Schiavone that he was concerned about the stress that this incident had put the detective under and

that he wanted to reach out to Detective Schiavone's girlfriend and apologize for any stress that

she may be put under because of the situation.

81.     On August 30, 2018, Detective Schiavone was denied access to the detective bureau

office by Chief Vasque and ordered by Sgt. Burk to turn over his open case materials for re-

assignment to other detectives. Captain Driscoll confirmed his case material reassignment and

ordered him to update Sgt. Burke with any newly acquired relevant case information as it came in.

Detective Schiavone was then assigned to the administrative unit and Sergeant Sandy Picard

(hereinafter "Sgt. Picard").

82.     After Detective Schiavone reported Sgt. Picard for his new assignment, she told

him that being assigned to her unit was a "soft landing." At one point she also told him that officers

who are assigned to her are problem employees for which she is required to document activities

on. At another point, she made a comment to administrative co-worker Annette Messina and

Officer Wayne Taylor, after a mouse or rat was spotted in the office, that she already had enough

rats in her office, an indication to Detective Schiavone that she had just called him a "rat."

83.     Detective Schiavone was ultimately stripped of his unmarked police cruiser and

forced to perform menial secretarial work with no direction on future work assignments. Often

times, Detective Schiavone would be left with no work to do and no assignments clarified, causing

him to sit inactive for long periods of time.

84.     Detective Schiavone has been given no clear duty assignment other than to respond to court requests for 911/turret communications for court proceedings.

85.     On October 9, 2018, Detective Schiavone sent an email to Chief Vasque requesting a transfer out of his assignment with Sgt. Picard and into Community Policing with Lt. Cerullo. On October 15, 2018 Chief Vasque answered that he, (the Chief), can modify any employee in a special assignment position (as detectives is a special assignment position) and that Detective Schiavone was to continue receiving assignments from Sgt. Picard in Administration.

86.     At one point, Det. Schiavone was offered a position in a Domestic Violence role, but respectfully declined to accept the assignment stating it was not the area of specialty he had envisioned for his career path.

87.     Detective Schiavone continued working in his assigned position in an exemplary manner. In the mean-time, he was called to a meeting with Chief Vasque and Union Attorney Matthew Dwyer. At the scheduled November 15, 2018th meeting, Chief Vasque, City Attorney Robert Hillman, Union Attorney Matthew Dwyer, Union President Alan Andrews, Captain James Fitzpatrick and Detective Schiavone all met to discuss Detective Schiavone's work assignment and related issues.

88.     During the meeting, Detective Schiavone requested his detective duty assignment be reinstated and he was informed by Chief Vasque that because he was at odds with Lt. Ciccarelli, Sgt. Burke and Sgt. Beaulieu, that would not happen. Detective Schiavone restated that he would take an assignment with Lt. Cerullo or take a night shift detectives assignment away from direct supervision from Lt. Ciccarelli. Chief Vasque reiterated the only assignment he would approve would be in the domestic violence role he was previously offered. Detective Schiavone declined that assignment.

89.     Detective Schiavone reminded Chief Vasque that he had done nothing wrong and that he shouldn't be the one made to suffer because of Lt. Ciccarelli's illegal and inappropriate behaviors. Detective Schiavone stated that Lt. Ciccarelli should be the one being reassigned and not he.

90.     The meeting concluded with no agreements or other changes to Detective Schiavone's duty assignment.

91.     Detective Schiavone continues to work in Administration, not utilizing his training and experience as a police officer and detective, performing menial tasks.

92.     Detective Schiavone continues to receive unwarranted harassment from co-workers and supervisors due to how Lt. Ciccarelli and Chief Vasque handled the entire situation and their actions.

93.     Detective Schiavone is being treated unfairly and is being punished for his reporting of serious criminal activity by Lt. Ciccarelli and Chief Vasque. Chief Vasque and Lt. Ciccarelli and the City of Lawrence are denying Detective Schiavone's enjoyment of his employment and are discriminating against him due to his whistleblower status.

94.     Lt. Ciccarelli was allowed to unfairly interrogate and impugn Detective Schiavone's character and actions regarding Lt. Ciccarelli's failure to follow state law and his disregard for the safety of civilians, specifically, a 12 year old boy, by leaving his firearm unattended and unlocked.

95.     The months of untoward actions against Detective Schiavone by police department members and supervisors, combined with the threat of discipline, loss of preferred duty assignments and potential for the loss of his employment has caused him considerable emotional distress and concern.

96.     Detective Schiavone has never been interviewed by Internal Affairs officers and has never been told he was under investigation or been formally disciplined for any activities.

97.     Detective Schiavone has been subjected to repeated harassment, threats, intimidation and coercion by members of the LPD for his questioning and reporting of supervisory actions and a supervisor's illegal and dangerous behavior.

98.     It is demonstrably clear that the retaliation and hostile treatment toward Detective Schiavone and his reassignment to a clerical type, undesirable duty assignment has been a direct consequence of his reporting of a matter of public concern—that being illegal and improper behavior—and Lt. Ciccarelli's and Chief Vasque's inappropriate handling of the situation.

99.     In early 2019, the Department, at the order of Chief Vasque, installed surveillance cameras around the City, more specifically, throughout the police station.

100.    Cameras were installed (fixed and recording all comings and goings) outside Detective's Schiavone's work area, the administrative trailer, after he was assigned to work there. The cameras clearly document anyone entering and exiting the trailer.

101.    Shortly after Detective Schiavone filed his initial Complaint with this Court, another surveillance camera was installed directly behind his work station in the administrative trailer.

102.    The cameras are positioned so that all of Detective Schiavone's activities are able to be closely monitored when he is at work.

103.    Detective Schiavone requested his work station be moved to the other side of the trailer and Sgt. Picard told him he was to stay where he was because he needed to be watched.

104.    The installation of the cameras is a further attempt to harass and punish Detective

Schiavone and cause undue stress and anxiety while he is at work for the Defendants.

## COUNT I
## VIOLATION OF CIVIL RIGHTS 42 U.S.C. §1983
**(Defendants City of Lawrence, Chief Roy Vasque, and Lieutenant Mark Ciccarelli)**

105.    Plaintiff incorporates herein the previous allegations set forth in this Complaint.

106.    Defendants City of Lawrence, Chief Roy Vasque, and Lieutenant Mark Ciccarelli

in their official and individual capacities, and under color of law, attempted to interfere with, and

did interfere with Plaintiff Kevin Schiavone's exercise and enjoyment of rights secured by the

Constitution and laws of the United States and the Massachusetts Declaration of Rights, including,

but not limited to, his right to free speech, right to participate in concerted union activity, right to

procedural and substantive due process, right to continued employment and right to petition and

seek redress from Government abuse without retaliation.

107.    As a Government employee, Plaintiff Schiavone engaged in his right to engage in

free speech and to petition the Government for a redress of grievances on a matter of public

importance—the dangerous matter involving the violation of state law and department policy by

Defendant Ciccarelli--which is protected by the First Amendment.

108.    Plaintiff Schiavone's protected activity was a substantial or motivating factor in the

Defendants' retaliatory action against him in demoting him from his employment position;

assigning him menial clerical work; subjecting him to intimidation, threats, harassment and

coercion; causing a hostile work environment; preventing his participation in protected union

activities; and, taking disciplinary action against him without redress or due process.

109.    The Defendants would not have taken the same action against the Plaintiff even

absent his protected activities.

110.     As a consequence of the Defendants' actions, the Plaintiff has suffered and continues to suffer economic loss, fear and emotional distress, loss of status in his community, loss of reputation and promotional opportunities.

111.     Plaintiff seeks compensatory as well as punitive damages against the Defendants for their actions, as well as reasonable attorneys' fees and such other relief as the Court deems appropriate.

## COUNT II
## WHISTLEBLOWER (M.G.L. c. 149 § 185)
### (Defendants City of Lawrence, Chief Roy Vasque, and Lieutenant Mark Ciccarelli)

112.     Plaintiff incorporates herein the previous allegations set forth in this Complaint.

113.     Plaintiff reported and objected to what he reasonably believed were violations of law, and/or rules and regulations within the Lawrence Police Department including but not limited to illegal and/or unethical actions by supervising officers, violations of department rules, policies and procedures, and violations of the collective bargaining agreement by Defendants.

114.     The Defendants retaliated against Plaintiff for reporting, disclosing, objecting to and/or refusing to participate in an activity, policy or practice which Plaintiff reasonably believed was in violation of a law and/or a rule or regulation promulgated by law, in violation of the Massachusetts Whistleblower Statute, G.L. c. 149 §185, b(1) and b(3).

115.     Plaintiff has been retaliated against for reporting and objecting to Defendants' actions and as a result of raising these issues was subsequently subjected to disparate treatment; a hostile work environment; threats of discipline; retaliatory acts; denial of promotion; loss of income; and, reassignment from his regular employment position.

116.     As a consequence of the Defendants' actions as stated above, Plaintiff suffered and continues to suffer damages, including but not limited to: loss of income, loss of employment

status; loss of professional opportunities; loss of personal and professional reputation; loss of community standing; and, other financial losses, and emotional and mental distress.

## COUNT III
### MASSACHUSETTS CIVIL RIGHTS (M.G.L. c. 12, §§ 11H, I)
### (Defendants City of Lawrence, Chief Roy Vasque, and Lieutenant Mark Ciccarelli)

117.    The Plaintiff incorporates herein the previous allegations set forth in this Complaint.

118.    Defendants City of Lawrence, Chief Roy Vasque, and Lieutenant Mark Ciccarelli in their official and individual capacities, attempted to interfere with, and did interfere with Plaintiff Kevin Schiavone's exercise and enjoyment of rights secured by the Constitution and laws of the United States and the Massachusetts Declaration of Rights, including, but not limited to, his right to free speech, right to participate in concerted union activity, right to procedural and substantive due process, right to continued employment and right to petition and seek redress from Government abuse without retaliation.

119.    As a Government employee, Plaintiff Schiavone engaged in his right to engage in free speech and to petition the Government for a redress of grievances on a matter of public importance—the dangerous matter involving the violation of state law and department policy by Defendant Ciccarelli.

120.    Plaintiff Schiavone's protected activity was a substantial or motivating factor in the Defendants' retaliatory action against him in demoting him from his employment position; assigning him menial clerical work; subjecting him to intimidation, threats, harassment and coercion; causing a hostile work environment; preventing his participation in protected union activities; and, taking disciplinary action against him without redress or due process.

121.    Defendants attempted to and did interfere with the Plaintiff's above stated rights by means of threats of discipline, economic coercion and retaliatory intimidation in an attempt to silence the Plaintiff's right of free speech; right to participate in union activities; right of continued employment; and, due process of law.

122.    The Defendants would not have taken the same action against the Plaintiff even absent his protected activities.

123.    As a consequence of the Defendants' actions, the Plaintiff has suffered and continues to suffer economic loss, fear and emotional distress, loss of status in his community, loss of reputation and promotional opportunities.

**COUNT IV**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Defendants Chief Roy Vasque and Lieutenant Mark Ciccarelli)**

124.    The Plaintiff incorporates herein the previous allegations set forth in this Complaint.

125.    As stated above, the conduct of the Defendants toward the Plaintiff was extreme in degree and outrageous in character, resulting in the intentional and reckless infliction of emotional distress upon Plaintiff.

126.    By the actions stated above, Defendants intended to inflict, and did inflict, emotional distress upon Plaintiff or knew or should have known that emotional distress was a likely result of Defendants' conduct.

127.    Defendants' conduct as alleged above was extreme and outrageous, beyond all possible bounds of decency and was utterly intolerable.

128.     The outrageous actions of the Defendants were the cause of Plaintiff's distress and the emotional distress sustained by the Plaintiff and is of a nature that no reasonable person could be expected to endure.

129.     As a result of the outrageous actions of the Defendants, Plaintiff was caused to suffer emotional injuries and damages.

## **PRAYER**

**WHEREFORE,** Plaintiff requests this Honorable Court order the following relief:

1.  Judgment against Defendants on Count I;

2.  Judgment against Defendants on Count II, plus interest and costs of this action, treble damages and reasonable attorneys' fees as provided under G.L. c. 149, §185;

3.  Judgment against Defendants on Count III plus interest and costs of this action, and reasonable attorneys' fees as provided under G.L. c. 12, § 11I;

4.  Judgment against Defendants on Count IV.

**THE PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL COUNTS.**

Dated: June 28, 2019

Respectfully submitted,
For Plaintiff,
By his attorney,

/s/ Seldon E. Nason, Jr.
Seldon E. Nason, Jr., BBO# 696905
117 Brockway Road
Hopkinton, NH 03229
P: (617) 433-7378
F: (603) 505-4729
E: sen@masslawyer.us

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent this day to those participants indicated as non-registered participants.

Dated:  June 28, 2019

*/s/ Seldon E. Nason, Jr.*
Seldon E. Nason, Jr., BBO# 696905